Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
11/05/2021 08:09 AM CDT

Natalie Baker-Heser, M.D., and Stacey
Werth-Sweeney, appellants, v. State of
Nebraska and Nebraska Department
of Health and Human
Services, appellees.

___ N.W.2d ___

Filed August 13, 2021.    No. S-20-758.

1. **Summary Judgment: Appeal and Error.** An appellate court will affirm a lower court's grant of summary judgment if the pleadings and admitted evidence show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law. An appellate court reviews the district court's grant of summary judgment de novo, viewing the record in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor.

2. **Rules of Evidence: Hearsay: Appeal and Error.** Apart from rulings under the residual hearsay exception, an appellate court reviews for clear error the factual findings underpinning a trial court's hearsay ruling and reviews de novo the court's ultimate determination to admit evidence over a hearsay objection or exclude evidence on hearsay grounds.

3. **Motions to Dismiss: Pleadings: Appeal and Error.** A district court's grant of a motion to dismiss on the pleadings is reviewed de novo, accepting the allegations in the complaint as true and drawing all reasonable inferences in favor of the nonmoving party.

4. **Statutes: Appeal and Error.** Statutory interpretation presents a question of law, for which an appellate court is obligated to reach an independent conclusion irrespective of the decision made by the court below.

5. **Fair Employment Practices: Proof.** In order to show retaliation under the Nebraska Fair Employment Practice Act, a plaintiff must establish (1) he or she engaged in protected conduct, (2) he or she was subjected

to an adverse employment action, and (3) there was a causal connection between the protected conduct and the adverse action.

6. **Fair Employment Practices: Words and Phrases.** The "practice" in Neb. Rev. Stat. § 48-1114(1)(c) (Cum. Supp. 2020) refers to an unlawful practice of the employer.

7. **Fair Employment Practices: Statutes.** The Nebraska Fair Employment Practice Act is not a general "bad acts" statute.

8. **Fair Employment Practices.** The evil addressed by Neb. Rev. Stat. § 48-1114(1)(c) (Cum. Supp. 2020) is the exploitation of an employer's power over an employee when used to coerce the employee to endorse, through participation or acquiescence, the unlawful acts of the employer.

9. ____. Neb. Rev. Stat. § 48-1114(1)(c) (Cum. Supp. 2020) does not protect an employee's opposition to the unlawful activities of fellow employees.

10. **Statutes: Judicial Construction: Legislature: Intent: Presumptions.** Where a statute has been judicially construed and that construction has not evoked an amendment, it will be presumed that the Legislature has acquiesced in the court's determination of the Legislature's intent.

11. **Fair Employment Practices.** To present a prima facie claim under the Nebraska Fair Employment Practice Act, the employee must show either his or her opposition to an unlawful practice of the employer or the employee's refusal to honor an employer's demand that the employee do an unlawful act.

12. **Appeal and Error.** To be considered by an appellate court, the party asserting the alleged error must both specifically assign and specifically argue it in the party's initial brief.

13. **Rules of Evidence: Hearsay: Proof.** Hearsay is defined as a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.

14. **Hearsay.** An out-of-court statement is not hearsay if the proponent offers it for a purpose other than proving the truth of the matter asserted.

15. ____. A statement is not hearsay if the proponent offers it to show its impact on the listener and the listener's knowledge, belief, response, or state of mind after hearing the statement is relevant to an issue in the case.

16. **Statutes: Immunity: Waiver.** Statutes purporting to waive the State's protection of sovereign immunity are strictly construed in favor of the sovereign and against waiver.

17. ____: ____: ____. A waiver of sovereign immunity is found only where stated by the most express language of a statute or by such overwhelming implication from the text as will allow no other reasonable construction.

18. **Immunity: Waiver.** Nothing about allowing a private right of action is an express or implied waiver of the State's sovereign immunity.
19. \_\_\_\_: \_\_\_\_. The sovereign must prevail if there is any doubt as to whether immunity has been waived.
20. **Appeal and Error.** An appellate court is not obligated to engage in an analysis that is not necessary to adjudicate the case and controversy before it.

Appeal from the District Court for Lancaster County: Robert R. Otte, Judge. Affirmed.

David A. Domina, of Domina Law Group, P.C., L.L.O., for appellants.

Heidi A. Guttau, of Baird Holm, L.L.P., for appellees.

Heavican, C.J., Cassel, Stacy, Funke, Papik, and Freudenberg, JJ., and Welch, Judge.

Cassel, J.

## INTRODUCTION

Two employees of a state hospital highlighted deficient recordkeeping by hospital psychiatrists. Following an investigation, the Nebraska Department of Health and Human Services (DHHS) fired the two employees. These former employees sued DHHS, alleging violations of the Nebraska Fair Employment Practice Act (NFEPA)[1] and the Health Care Facility Licensure Act (HCFLA).[2] The district court dismissed the HCFLA claims on sovereign immunity grounds and granted DHHS' motion for summary judgment on the NFEPA claims. Because the former employees did not show that they complained about an unlawful practice of DHHS and because the State did not waive its sovereign immunity for claims under the HCFLA, we affirm the district court's judgment.

---

[1] Neb. Rev. Stat. §§ 48-1101 to 48-1125 (Reissue 2010 & Cum. Supp. 2020).

[2] Neb. Rev. Stat. §§ 71-401 to 71-476 (Reissue 2018 & Cum. Supp. 2020).

## BACKGROUND

### Lincoln Regional Center

DHHS operates the Lincoln Regional Center (LRC). The LRC is a state hospital.[3] Because many psychiatrists will not work at state hospitals, the LRC has difficulty recruiting psychiatrists. The LRC is licensed under an administrative regulation[4] and is obligated to meet requirements specified in state[5] and federal[6] regulations. Requirements include having medical staff bylaws[7] and maintaining medical records.[8]

### Key Employees and Events

Stacey Werth-Sweeney (Sweeney) began employment at the LRC in 1989. Following a number of promotions, she became the facility operating officer in 2010. In that capacity, Sweeney's job duties included working with department heads to ensure policies and procedures were current, to ensure staff were trained, to lead quality improvement, and to oversee crises. She tracked any documentation delinquency and reported it to the medical director each month.

In 2015, the LRC rehired a psychiatrist, whom we will refer to as "Psychiatrist 1." The LRC knew that he had a long history of being delinquent in his medical recordkeeping. Psychiatrist 1 is Indian.

In February 2016, the LRC hired another psychiatrist, whom we will refer to as "Psychiatrist 2." When hired, Psychiatrist 2 had a private practice in Illinois and the medical director allowed him to continue his private practice for 1 year. In 2018, Psychiatrist 2's private practice remained open, resulting

---

[3] See Neb. Rev. Stat. § 83-305 (Reissue 2014).

[4] See 175 Neb. Admin. Code, ch. 9, § 004.01 (2006).

[5] See 175 Neb. Admin. Code, ch. 9.

[6] See 42 C.F.R. §§ 482.60 to 482.62 (2019).

[7] See 175 Neb. Admin. Code, ch. 9, § 006.

[8] *Id.*, § 006.07.

in his absence every other Monday and Tuesday. Psychiatrist 2 is Iranian.

In January 2017, Psychiatrist 2 received a written warning due to his failure to adhere to LRC's bylaws and agency values. Two months later, he filed a charge of discrimination against DHHS, alleging whistleblower retaliation for complaints he had made beginning in February 2016. In November 2017, Sweeney emailed a complaint about Psychiatrist 2's abusive behavior to the director of the division of behavioral health with DHHS and to Bo Botelho, DHHS' chief operating officer and general counsel. In December 2017, a psychologist emailed a complaint to Botelho and DHHS' director of human resources regarding unprofessional behavior by Psychiatrist 2.

On March 12, 2018, Natalie Baker-Heser, M.D. (Baker), became the LRC's medical director. Her job duties included providing leadership to medical staff at the LRC and promoting a sense of teamwork. Baker supervised six psychiatrists. Three of those six psychiatrists, including Psychiatrist 1 and Psychiatrist 2, were not current with patient documentation. The LRC's medical staff bylaws authorized the medical director to initiate investigations and to summarily suspend a practitioner when the practitioner's conduct threatened the life of a patient. And as a physician, Baker had a mandatory reporting obligation.[9]

In April 2018, Baker, along with the facilities director and a human resources partner, met with Psychiatrist 1 to discuss his more than 200 delinquent records (mostly patient contact notes and progress notes) and how they could assist him in becoming current. Approximately 5 weeks after becoming the medical director, Baker began recommending the employment termination of Psychiatrist 1 and Psychiatrist 2 (collectively the Psychiatrists). She observed numerous violations of medical recordkeeping requirements by them. Baker believed that

---

[9] See 172 Neb. Admin. Code, ch. 5, § 003 (2020).

the entire patient population cared for by Psychiatrist 2 was at risk and that noncompliance with laws and regulations involving patient safety put the LRC's accreditation at risk. According to Baker, LRC policies contain time requirements for completion of progress notes and assessments.

INVESTIGATION

In mid-April 2018, Grant Dugdale, an attorney, joined DHHS. He reported to Botelho. Dugdale had practiced law for over 30 years and had significant experience conducting workplace investigations. Soon after Dugdale started, Botelho asked him to advise Baker on issues related to Psychiatrist 2. Dugdale described being in a "counseling role" with Baker in which he was trying "to figure out what was going on, what her concerns were, how to address those concerns." Shortly after Dugdale did that, Botelho instructed him to conduct a "'top to bottom'" investigation of the LRC. Botelho issued an oral directive that DHHS was putting all employment-related decisions and terminations on hold at the LRC pending completion of Dugdale's investigation. DHHS put disciplinary actions on hold during the investigation because it wanted to ensure that there were legitimate, nondiscriminatory reasons for terminating the Psychiatrists' employment.

Dugdale completed his investigation within 1 month. As part of his investigation, he prepared interview summaries of the employees with whom he spoke. He learned from Sweeney that she had concerns regarding Psychiatrist 1's history of being late with patient documentation and that she had a history of conflict with Psychiatrist 2. The director of nursing told Dugdale that she believed Sweeney overstepped her bounds and interfered with nursing decisions. Dugdale learned from Baker that she wanted to immediately suspend Psychiatrist 1 due to his late documentation and that she wanted to terminate Psychiatrist 2's employment due to concerns about his delinquent patient documentation, his absence to attend to his private practice in Illinois, and his hostility toward others.

Dugdale concluded that the LRC was in dire need of leadership changes.

Dugdale recommended terminating Baker's and Sweeney's employment. He claimed that Baker failed to talk with the Psychiatrists about her concerns with their performance in any meaningful way before recommending their firings and that Baker's actions could expose DHHS to liability for discrimination claims. Dugdale noted Sweeney's history of interfering with or making clinical medical decisions, retaliating against individuals, and forcing employees to leave the LRC. On June 12, 2018, DHHS fired Baker and Sweeney. DHHS terminated the employment of the Psychiatrists 4 to 5 months later.

## Lawsuit

Baker and Sweeney (collectively the former employees) sued the State and DHHS (collectively DHHS) and requested a jury trial. The complaint alleged that DHHS retaliated against the former employees for "[r]efusing to conceal, and reporting violations of, and attempting to enforce, patient-protection laws" in their respective positions. According to the complaint, DHHS thwarted them from completing necessary administrative actions to protect patients and personnel from wrongful acts.

The former employees alleged that they observed and reported instances in which the Psychiatrists did not complete vital records such as reports and competency examinations and failed to complete psychiatric admission assessments and discharge summary reports on a timely basis. They claimed that the Psychiatrists' failure to abide by medical recordkeeping requirements placed patients in danger, inhibited effective care, violated patients' rights, delayed court proceedings which depended on timely and complete psychiatric records, endangered the community, placed the LRC's continued accreditation at risk, and undermined the LRC's mission and goals. The former employees alleged that DHHS prevented investigation, discipline, or remedial action against the Psychiatrists. They

asserted that DHHS' active attempts to conceal or permit deficient recordkeeping constituted an unlawful practice.

The former employees also alleged that they repeatedly reported to DHHS numerous complaints of harassment, intimidation, and abuse by Psychiatrist 2 made by several female DHHS employees. However, they later abandoned this claim in the district court.

The complaint asserted that the terminations were contrary to § 48-1114, to § 71-445, and to public policy. The former employees demanded "trial by jury on all issues so triable." With regard to § 48-1114, the former employees alleged that their actions and reports related to the Psychiatrists' unlawful practices—i.e., failure to comply with federal and state regulatory requirements concerning creation and maintenance of medical records—constituted protected activity. Pertinent to § 71-445, they alleged that DHHS' motivation for terminating their employment was their opposition to the Psychiatrists' violation of the regulatory scheme set forth in statutes and regulations.[10]

## Motions to Dismiss Claim and Strike Jury Demand

DHHS filed a motion to dismiss two of the claims for each former employee and to strike the jury demand. DHHS alleged that the wrongful discharge in violation of public policy claims should be dismissed due to noncompliance with the State Tort Claims Act and that the HCFLA claims should be dismissed because the State had not waived sovereign immunity for such claims. There is no dispute that DHHS never received any notices from the former employees under the State Tort Claims Act. DHHS further alleged that the former employees were not entitled to a jury trial and that the demand should be stricken. The former employees thereafter moved to dismiss without prejudice their claims that the terminations were contrary to public policy.

---

[10] See, § 71-401 et seq.; 175 Neb. Admin. Code, ch. 9.

The court sustained the motions. Thus, it dismissed the former employees' claims based on public policy and the HCFLA. It also struck the demand for a trial by jury.

### Motion for Summary Judgment and Ruling

DHHS moved for summary judgment, and the court entered an order sustaining the motion and dismissing the retaliation claims. With respect to the former employees' objections to witness statement summaries offered as exhibits on the grounds that they were not affidavits and were hearsay, the court stated that DHHS offered the witness interview summaries "not for the truth of the matter asserted, but instead, to show the listener's (i.e., Mr. Dugdale's) state of mind and nonretaliatory basis for recommending [the former employees'] termination."

The court determined that the former employees' claims were not cognizable under NFEPA because they were doing what the law required them to do, i.e., report violations of medical recordkeeping requirements. It reasoned that even if the claims were cognizable, the former employees could not establish all of the prima facie elements of retaliation because the medical recordkeeping practices of the Psychiatrists did not constitute unlawful actions within the meaning of NFEPA. The court also determined that the former employees could not establish the causal connection element, noting that they were not terminated until approximately 2 months after first complaining.

The former employees timely appealed, and we granted their petition to bypass review by the Nebraska Court of Appeals.[11]

### ASSIGNMENTS OF ERROR

The former employees assign that the district court erred in (1) entering summary judgment against them, (2) receiving witness interview summaries as evidence over hearsay objections, (3) dismissing their claims for wrongful termination

---

[11] See Neb. Rev. Stat. § 24-1106(2) (Cum. Supp. 2020).

in violation of § 71-445, and (4) striking their demand for a jury trial.

## STANDARD OF REVIEW

[1] An appellate court will affirm a lower court's grant of summary judgment if the pleadings and admitted evidence show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law. An appellate court reviews the district court's grant of summary judgment de novo, viewing the record in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor.[12]

[2] Apart from rulings under the residual hearsay exception, an appellate court reviews for clear error the factual findings underpinning a trial court's hearsay ruling and reviews de novo the court's ultimate determination to admit evidence over a hearsay objection or exclude evidence on hearsay grounds.[13]

[3] A district court's grant of a motion to dismiss on the pleadings is reviewed de novo, accepting the allegations in the complaint as true and drawing all reasonable inferences in favor of the nonmoving party.[14]

[4] Statutory interpretation presents a question of law, for which an appellate court is obligated to reach an independent conclusion irrespective of the decision made by the court below.[15]

## ANALYSIS

### Summary Judgment on NFEPA Claims

The former employees argue that the court erred in entering summary judgment against them on their NFEPA claims.

---

[12] *McCaulley v. C L Enters., ante* p. 141, 959 N.W.2d 225 (2021).

[13] *Brown v. Morello*, 308 Neb. 968, 957 N.W.2d 884 (2021).

[14] *Ryan v. Streck, Inc., ante* p. 98, 958 N.W.2d 703 (2021).

[15] *Id.*

They contend that their employment terminations were retaliatory. But DHHS counters that the retaliation claims fail as a matter of law for a variety of reasons. We begin with discussion of a retaliation claim under NFEPA.

[5] In order to show retaliation under NFEPA, a plaintiff must establish (1) he or she engaged in protected conduct, (2) he or she was subjected to an adverse employment action, and (3) there was a causal connection between the protected conduct and the adverse action.[16] Having been terminated from employment, the former employees undoubtedly suffered an adverse employment action. The primary dispute is whether they engaged in protected conduct.

As pertinent here, NFEPA makes it "an unlawful employment practice for an employer to discriminate against any of his or her employees . . . because he or she . . . has opposed any practice or refused to carry out any action unlawful under federal law or the laws of this state."[17] An action is "[u]nlawful under federal law or the laws of this state" if it is "contrary to or in defiance of the law or disobeying or disregarding the law."[18]

[6-9] In *Wolfe v. Becton Dickinson & Co.*,[19] we addressed the "practice" component of § 48-1114. We stated that it "refers to an unlawful practice of the employer."[20] We explained that "[t]he statute's purpose is not served by giving an extra layer of protection from discharge to those employees who happen to voice their opposition to any manner of unlawful activity."[21] Although we recognized that it may be unfair to disadvantage an employee for opposing unlawful activities unrelated to employment, we emphasized that NFEPA is not a general

---

[16] *Haffke v. Signal 88*, 306 Neb. 625, 947 N.W.2d 103 (2020).

[17] § 48-1114(1)(c).

[18] § 48-1102(15).

[19] *Wolfe v. Becton Dickinson & Co.*, 266 Neb. 53, 662 N.W.2d 599 (2003).

[20] *Id.* at 57, 662 N.W.2d at 603.

[21] *Id.*

"bad acts" statute.[22] We clarified that the evil addressed by § 48-1114(3)—now located at § 48-1114(1)(c)—is the exploitation of an employer's power over an employee when used to coerce the employee to endorse, through participation or acquiescence, the unlawful acts of the employer.[23] And we observed that the legislative intent was "'to provide some protection for employees in the private sector who are asked by their employer or labor union to do something that is illegal.'"[24] Thus, we determined that NFEPA does not protect an employee's opposition to the unlawful activities of fellow employees.[25]

Nine years after *Wolfe*, the Court of Appeals decided *Bonn v. City of Omaha*[26] and applied our narrow interpretation of § 48-1114. In *Bonn*, the city fired its public safety auditor after the auditor reported that members of the police department acted with discrimination toward minority members of the public. In finding no violation under § 48-1114, the Court of Appeals reasoned that "[t]he practices being opposed must be unlawful practices of the employer, here the City of Omaha, and not unlawful actions by individuals or coemployees."[27]

[10] Nearly two decades have elapsed since we construed § 48-1114 in *Wolfe*, and the Legislature has not substantively changed that language. Where a statute has been judicially construed and that construction has not evoked an amendment, it will be presumed that the Legislature has acquiesced in the court's determination of the Legislature's intent.[28] The

---

[22] *Id.* at 58, 662 N.W.2d at 603 (internal quotation marks omitted).

[23] See *Wolfe v. Becton Dickinson & Co., supra* note 19.

[24] *Id.* at 58, 662 N.W.2d at 604. See, also, Neb. Rev. Stat. § 48-1126 (Reissue 2010) (state agencies may be sued upon claims under NFEPA in same manner as provided by such law for suits against other employers).

[25] See *Wolfe v. Becton Dickinson & Co., supra* note 19.

[26] *Bonn v. City of Omaha*, 19 Neb. App. 874, 814 N.W.2d 114 (2012).

[27] *Id.* at 882, 814 N.W.2d at 121.

[28] *Rodriguez v. Lasting Hope Recovery Ctr.*, 308 Neb. 538, 955 N.W.2d 707 (2021).

Legislature amended the statute once after the *Wolfe* and *Bonn* decisions, but other than renumbering § 48-1114(3) to § 48-1114(1)(c), nothing in the amendment altered the construction given by the appellate courts.[29] If the Legislature wished to protect from retaliation an employee who opposed a coworker's unlawful actions, it could have done so. Because it has not, we view our narrow interpretation of § 48-1114 in *Wolfe* as having received legislative acquiescence.

The former employees identified their alleged protected conduct in their complaint. They asserted that they engaged in protected activity via their "actions and reports related to [the Psychiatrists'] unlawful practices *i.e.*, failure to comply with federal and state regulatory requirements concerning creation and maintenance of medical records." The former employees had a reasonable, good faith belief that the Psychiatrists were not complying with laws regarding completion of records, i.e., that they were committing unlawful acts.

[11] The record shows that the former employees opposed the Psychiatrists' unlawful acts. But the Psychiatrists were not the former employees' "employer." To present a prima facie claim under NFEPA, the employee must show either his or her opposition to an unlawful practice *of the employer* or the employee's refusal to honor an employer's demand that the employee do an unlawful act.[30] The former employees' opposition to the Psychiatrists' actions cannot support a prima facie case of retaliation under § 48-1114(1)(c).

The complaint alleged that DHHS' "active attempts to conceal or permit" deficient recordkeeping constituted an unlawful practice. And the former employees claim in their brief that they were fired for refusing "to go along with a cover up."[31] But we are not presented with a situation where DHHS asked the former employees to perform an unlawful act. The

---

[29] See 2019 Neb. Laws, L.B. 217.

[30] See *Wolfe v. Becton Dickinson & Co., supra* note 19.

[31] Brief for appellants at 17, 18.

evidence shows that Baker wished to take disciplinary action against the Psychiatrists, but that a directive placed employment-related decisions on hold pending completion of Dugdale's investigation. Although Baker was not allowed to suspend or fire the Psychiatrists prior to completion of the investigation, there is no evidence that she or Sweeney were instructed to cease complaining about or reporting the Psychiatrists' record deficiencies. The former employees' complaints about the Psychiatrists simply do not challenge any unlawful act by DHHS as their employer. Because they opposed alleged unlawful actions by coemployees and not practices of DHHS, their cause of action does not lie in NFEPA.

Moreover, the former employees cannot establish a causal connection between their reports about the Psychiatrists and their employment terminations. Part of Sweeney's job duties was to report late documentation, and there is no dispute that DHHS was aware of the Psychiatrists' recordkeeping issues. Baker was hired in part in the hope that she could help the Psychiatrists improve in that area. Instead, Baker, within weeks of her hiring and while supported by Sweeney, sought to have the Psychiatrists suspended or fired. The former employees would have us believe that they were fired in retaliation for performing their job duties. Rather than showing that the former employees were fired for retaliatory reasons, the evidence shows that DHHS terminated their employment due to concerns about their leadership abilities. Employment discrimination laws have not vested in the Nebraska courts the authority to sit as super personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination.[32] The general rule in Nebraska is that unless constitutionally, statutorily, or contractually prohibited, an employer, without incurring liability, may terminate an

---

[32] See *Haffke v. Signal 88, supra* note 16.

at-will employee at any time with or without reason.[33] Because the former employees were employed at-will, DHHS could terminate their employment for any reason in the absence of a motive that was retaliatory or that contravened public policy.

We conclude the former employees failed to establish a prima facie case of retaliation. Accordingly, the district court did not err in granting summary judgment in favor of DHHS on the NFEPA causes of action.

## Hearsay

In connection with the summary judgment proceeding, the former employees raise a claim of evidentiary error. In the district court, they objected that witness interview summaries offered as evidence "are not affidavits, not admissible on summary judgment as statements . . . , and are hearsay." The court overruled the objections.

[12] The former employees' brief alludes, but does not assign error, to the summaries' being improper materials to support or oppose summary judgment.[34] To be considered by an appellate court, the party asserting the alleged error must both specifically assign and specifically argue it in the party's initial brief.[35] Even if error had been assigned to the form of the exhibits, it would have exulted form over substance. Dugdale's affidavit, exhibit 49, specifically identified, authenticated, and purported to attach the other exhibits which were not in the form of affidavits. Because the exhibits were submitted as PDF files, it may be a simple technical mistake that they were not attached. While the better practice may have been to ensure the attachment was accomplished, the former employees do not explain how they were prejudiced by this procedure.

---

[33] *O'Brien v. Bellevue Public Schools*, 289 Neb. 637, 856 N.W.2d 731 (2014).

[34] See Neb. Rev. Stat. § 25-1332(1) (Cum. Supp. 2020) (evidence receivable on motion for summary judgment includes "depositions, answers to interrogatories, admissions, stipulations, and affidavits").

[35] *In re Interest of Victor L., ante* p. 21, 958 N.W.2d 413 (2021).

In any event, they do assign error to and focus their argument on the receipt of the evidence over hearsay objections. We turn our attention to that issue.

[13-15] Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."[36] By definition, an out-of-court statement is not hearsay if the proponent offers it for a purpose other than proving the truth of the matter asserted.[37] Thus, a statement is not hearsay if the proponent offers it to show its impact on the listener and the listener's knowledge, belief, response, or state of mind after hearing the statement is relevant to an issue in the case.[38]

Federal and state courts have determined that internal documents of an employer related to employment decisions are not hearsay. The Eighth Circuit has stated that in employment discrimination cases, internal documents relied upon by the employer in making an employment decision are not hearsay; rather, such documents are relevant and admissible because they help explain the employer's conduct.[39] Other federal circuit courts have ruled similarly.[40] The New Jersey Supreme Court held that "when an employer defends against a claim that an employee's discharge was the product of retaliation, an investigative report prepared by the employer that purports

---

[36] Neb. Evid. R. 801(3), Neb. Rev. Stat. § 27-801(3) (Cum. Supp. 2020).

[37] *State v. Poe*, 292 Neb. 60, 870 N.W.2d 779 (2015).

[38] *Id.*

[39] See *Wolff v. Brown*, 128 F.3d 682 (8th Cir. 1997). See, also, *Hardie v. Cotter and Co.*, 849 F.2d 1097 (8th Cir. 1988); *Crimm v. Missouri Pacific R. Co.*, 750 F.2d 703 (8th Cir. 1984).

[40] See, e.g., *Luckie v. Ameritech Corp.*, 389 F.3d 708 (7th Cir. 2004); *Ryder v. Westinghouse Elec. Corp.*, 128 F.3d 128 (3d Cir. 1997); *Jones v. Los Angeles Community College Dist.*, 702 F.2d 203 (9th Cir. 1983); *Moore v. Sears, Roebuck and Co.*, 683 F.2d 1321 (11th Cir. 1982); *Zamora v. Board of Educ. for Las Cruces Public Schools*, 553 Fed. Appx. 786 (10th Cir. 2014).

to demonstrate a non-retaliatory reason for the employee's termination is a non-hearsay statement."[41] The Iowa Supreme Court likewise determined that "internal documents relied upon by an employer in making employment decisions in a discrimination case are generally not hearsay because they can be relevant to explain the employer's conduct."[42]

The district court determined that the exhibits were not hearsay. It noted that the witness interview summaries were authenticated by Dugdale's affidavit and stated that the exhibits were offered to show Dugdale's state of mind and nonretaliatory basis for recommending termination of the former employees' employment. The court explained: "[T]he truth of the matter asserted in each witness interview summary or investigative report is not at issue or even relevant in this case. Rather, what is relevant is whether [DHHS] investigated, interviewed witnesses, and had a good faith belief in the grounds asserted at the time of termination."

We see no clear error in any of the court's factual findings, and on de novo review, we find no error in the admission of these exhibits. Because the summaries were not offered to prove the truth of the matter asserted, the district court properly overruled the hearsay objections.

WRONGFUL TERMINATION UNDER HCFLA

The former employees next argue that the court erred in dismissing their claims for retaliation under the HCFLA after determining that the State had not waived its sovereign immunity. Section 71-445(1) of the HCFLA provides:

A health care facility or health care service shall not discriminate or retaliate against a person . . . employed at such facility . . . who has presented a complaint or

---

[41] *Carmona v. Resorts Int'l. Hotel*, 189 N.J. 354, 359-60, 915 A.2d 518, 521 (2007).

[42] *McElroy v. State*, 637 N.W.2d 488, 502 (Iowa 2001).

provided information to the administrator of such facility or service or [DHHS]. Such person may maintain an action for any type of relief . . . permitted by law.

There is no dispute that the HCFLA applies to the LRC.

The dispute centers on whether § 71-445 waived the State's sovereign immunity.[43] DHHS is a state agency,[43] and an action against a state agency is an action against the State.[44] Our constitution allows the State to be sued, but specifies that "the Legislature shall provide by law in what manner and in what courts suits shall be brought."[45] Thus, we have long held that no suit may be maintained against the State unless the Legislature, by law, has so provided.[46]

[16-18] It is well settled that statutes purporting to waive the State's protection of sovereign immunity are strictly construed in favor of the sovereign and against waiver.[47] A waiver of sovereign immunity is found only where stated by the most express language of a statute or by such overwhelming implication from the text as will allow no other reasonable construction.[48] For example, the State is subject to be sued under NFEPA because a statute expressly provides that "[t]he state and governmental agencies created by the state may be sued upon claims arising under the [NFEPA] in the same manner as provided by such law for suits against other employers."[49] There is no similar express waiver of sovereign immunity in the HCFLA. And we have declared that nothing about

---

[43] See Neb. Rev. Stat. § 81-3111 (Reissue 2014).

[44] See *State ex rel. Rhiley v. Nebraska State Patrol*, 301 Neb. 241, 917 N.W.2d 903 (2018).

[45] Neb. Const. art. V, § 22.

[46] See *Edwards v. Douglas County*, 308 Neb. 259, 953 N.W.2d 744 (2021).

[47] See, *id.*; *Burke v. Board of Trustees*, 302 Neb. 494, 924 N.W.2d 304 (2019).

[48] *Edwards v. Douglas County, supra* note 46; *Burke v. Board of Trustees, supra* note 47.

[49] § 48-1126.

allowing a private right of action is an express or implied waiver of the State's sovereign immunity.[50]

We find helpful our analysis in *Edwards v. Douglas County*.[51] In *Edwards*, the plaintiff argued that Nebraska's Emergency Telephone Communications Systems Act[52] should be construed as a waiver of sovereign immunity for claims alleging negligence against any provider of 911 emergency dispatch services. We recognized that the Political Subdivisions Tort Claims Act[53] provided the exclusive means by which to maintain a tort claim against a political subdivision and its employees and that the Political Subdivisions Tort Claims Act made no reference to any statute contained in the Emergency Telephone Communications Systems Act.

Similar to the Political Subdivisions Tort Claims Act at issue in *Edwards*, the Legislature in the State Tort Claims Act[54] declares:

> The State of Nebraska shall not be liable for the torts of its officers, agents, or employees, and no suit shall be maintained against the state, any state agency, or any employee of the state on any tort claim except to the extent, and only to the extent, provided by the State Tort Claims Act.[55]

Like the Political Subdivisions Tort Claims Act, the State Tort Claims Act provides the "exclusive" means to maintain a tort claim and suit against the State and its employees.[56] And although the State Tort Claims Act expressly refers to and

---

[50] *State ex rel. Rhiley v. Nebraska State Patrol, supra* note 44.

[51] *Edwards v. Douglas County, supra* note 46.

[52] Neb. Rev. Stat. §§ 86-420 to 86-441.01 (Reissue 2014).

[53] Neb. Rev. Stat. §§ 13-901 to 13-928 (Reissue 2012 & Cum. Supp. 2020).

[54] Neb. Rev. Stat. §§ 81-8,209 to 81-8,235 (Reissue 2014 & Cum. Supp. 2020).

[55] § 81-8,209.

[56] See § 81-8,229.

incorporates statutes outside of the act,[57] it does not refer to any statute contained within the HCFLA. Nor does the HCFLA make reference to the State Tort Claims Act.

[19] The former employees contend that federal requirements for benefits coupled with the language of § 71-445 create an overwhelming implication from the text that the State waived sovereign immunity. We are not persuaded. And because the sovereign must prevail if there is any doubt as to whether immunity has been waived,[58] we do not read § 71-445 as a waiver of sovereign immunity. Accordingly, the district court did not err in dismissing the claims for retaliation under the HCFLA based on the State's sovereign immunity.

## Right to Jury Trial

[20] Finally, the former employees challenge the striking of their demand for a jury trial. An appellate court is not obligated to engage in an analysis that is not necessary to adjudicate the case and controversy before it.[59] Because we agree with the court's entry of summary judgment on the former employees' NFEPA claims and its dismissal of their claims under the HCFLA, no claims remain for trial. We need not resolve this issue.

## CONCLUSION

Because the former employees did not establish that they engaged in protected activity, the district court properly entered summary judgment against them on their NFEPA claims. The court did not err in receiving witness interview summaries over hearsay objections, because the summaries were not offered to prove the truth of the matter asserted. And because the State did not waive its sovereign immunity to suit under the

---

[57] See, e.g., §§ 81-8,210, 81-8,212, 81-8,215.01, 81-8,219, 81-8,220, 81-8,225, and 81-8,227.

[58] See *Edwards v. Douglas County, supra* note 46.

[59] *Seldin v. Estate of Silverman*, 305 Neb. 185, 939 N.W.2d 768 (2020).

HCFLA, the court properly dismissed those claims. We affirm the district court's judgment.

AFFIRMED.

MILLER-LERMAN, J., not participating.

WELCH, Judge, concurring.

Regarding that portion of the opinion analyzing the district court's grant of summary judgment on the former employees' NFEPA claims, I concur with the result on the basis that the former employees failed to establish a prima facie case of retaliation because they failed to establish a causal connection between their reports about the Psychiatrists and their employment terminations. I join the opinion of the court regarding the other issues presented.